IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-03098-NYW-KAS

MARK C. BEACHLEY,

     Plaintiff,

v.

TRANS UNION, LLC,

     Defendant.

_____

**ORDER AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

**ENTERED BY MAGISTRATE JUDGE KATHRYN A. STARNELLA**

     This matter is before the Court on Defendant's **Supplemental Motion for Sanctions and Attorney's Fees Pursuant to Rule 26 and Memorandum in Support** [#92] (the "Motion"). Plaintiff filed a Response [#95] in opposition to the Motion [#92], and Defendant filed a Reply [#96]. The Court has reviewed the Motion [#92], the entire case file, and the applicable law, and held a hearing on January 21, 2025, at which four individuals testified: (1) Defendant's counsel Amanda Loughmiller ("Loughmiller"); (2) Plaintiff; (3) Plaintiff's counsel Neil Anthony Camera ("Camera"); and (4) Plaintiff's counsel Stephen E. Berken ("Berken").[1] *See Minutes* [#110]. For the reasons set forth below, the Court **RECOMMENDS** that the Motion [#92] be **GRANTED in part** and the Motion [#92] is otherwise **DENIED in part and GRANTED in part**.[2]

---

[1] Plaintiff waived his attorney-client privilege for purposes of the hearing. *Tr.* [#113] at 81:13-18.

[2] Defendant's request for fees from Plaintiff and Plaintiff's counsel is a non-dispositive sanction, on which the Court issues an order, and its request for dismissal of Plaintiff's remaining claim is dispositive, on which the Court issues a recommendation. *See Merrill v. Contract Freighters, Inc.*, No. 19-cv-02309-CMA-SKC, 2021 WL 3742242, at *1 n.3 (D. Colo. Aug. 24, 2021) (determining

## I. Background

Except where noted, the following is undisputed for purposes of resolving the present Motion [#92]. Because a precise timeline of events is important for adjudicating at least some parts of the Motion [#92], the Court begins there.

Plaintiff's claims stem from an alleged fraudulent automobile loan that Plaintiff opened with 26 Motors and Palisades Funding Corp. ("Palisades") in November 2021. *Compl.* [#7-3] ¶¶ 15-18. Plaintiff alleged in the Complaint [#7-3] that, "[i]nstead of providing Plaintiff with a loan as initially discussed for the balance ( . . . approximately $5000), 26 Motors, as an agent for Palisades, presented Plaintiff with loan documents on November 15, 2021, for a loan amount of $62,000." *Id.* ¶ 17.

Sometime prior to the filing of this lawsuit, Plaintiff filed a separate action in New York against 26 Motors and Palisades which was later settled in full.[3] *See Compl.* [#7-3] ¶¶ 21-24. The Settlement Agreement required the removal "of all entries pertaining to [Plaintiff] and [the Account] and the Vehicle completely from all 3 credit bureaus (Trans Union, Experian, and Equifax)[.]" *Id.* ¶ 25. Plaintiff alleges that Palisades failed to comply with the Settlement Agreement, which led Plaintiff to dispute the account with Trans Union, LLC. *Id.* ¶¶ 26-27. Trans Union purportedly contacted Palisades for verification of the information received from Palisades, which Palisades confirmed as accurate. *Id.* ¶ 27. Thus, "the derogatory accounts related to the fraudulent loan" continued to show on Plaintiff's credit report. *Id.* ¶ 29.

---

by order the amount of fees to be awarded in connection with a motion for sanctions, and noting that the District Judge had already resolved the dispositive issue regarding dismissal).

[3] This statement is undisputed, although the Complaint [#7-3] states that the litigation was commenced only against 26 Motors. *See* [#7-3] ¶ 22. Defendant Palisades may have been a later addition to the lawsuit.

The present lawsuit was filed on October 5, 2023, in state court by Mr. Berken of Berken Cloyes, PC, on behalf of Plaintiff. *See Compl.* [#7-3] at 8; *Notice of Removal* [#1] at 1. Plaintiff originally asserted two claims in this lawsuit, although only the first remains: (1) violation of the Colorado Consumer Credit Reporting Act against Defendant Trans Union, LLC, and (2) common law fraud against former Defendant Palisades. *Id.* ¶¶ 35-42; *Order* [#59] (dismissing the fraud claim). Plaintiff asserts that he has suffered "actual damages including without limitation, loss of credit, damage to reputation, loss of employment opportunities, embarrassment, humiliation and other emotional and mental distress." *Compl.* [#7-3] ¶ 32. As a result, he seeks actual, statutory, and punitive damages as relief in connection with his remaining claim. *Id.* ¶¶ 33-34.

In November 2023, Mr. Camera returned to work at Berken Cloyes, PC, and was assigned to work on this lawsuit on behalf of Plaintiff. *Tr.* [#113] at 157:6-10.[4] On November 21, 2023, Defendant Trans Union, through its attorney Ms. Loughmiller, filed a Notice of Removal [#1] to the United States District Court.

On February 20, 2024, Plaintiff served his initial disclosures, under Mr. Berken's signature, identifying as a person likely to have discoverable information: "[a] representative of Academy Bank, Recruitment Department, regarding the declination of an offer of employment. Contact person: Andrew Retelsdorf" ("Retelsdorf").[5] *Def.'s Hearing Ex. 13* at 1. The initial disclosures also identified as a document relevant to

---

[4] The Court generally cites the CM/ECF page numbering for all documents on the electronic docket. However, for hearings and depositions, the Court cites the transcripts' original numbering.

[5] Mr. Retelsdorf is occasionally accidentally referred to as "Anthony Retelsdorf" at various points in the record, but there is no dispute that this reference is to Andrew Retelsdorf.

disputed facts: "[c]orrespondence from Academy Bank dated September 23, 2023." *Id.* at

2.

Mr. Camera testified that around this time, in February of 2024, he was notified

that Mr. Retelsdorf had been identified as a "smoking gun" witness who would be able to

testify to damages incurred by Plaintiff. *Tr.* [#113] at 157:10-14. Mr. Camera met with

Plaintiff in Mr. Camera's office, at which time Mr. Camera texted with Mr. Retelsdorf using

Plaintiff's phone. *Id.* at 157:15-17. Mr. Camera also later called and spoke with Mr.

Retelsdorf directly. *Id.* at 157:17-18. Mr. Camera described Mr. Retelsdorf as follows from

these initial communications:

> Mr. Retelsdorf is very - - he is very articulate. He is very long-winded. So
> his correspondences with me were very convincing, multiple paragraphs,
> references to insider information, insider knowledge, which I surmise having
> worked at Academy Bank, it makes sense that he would know the
> nomenclature. He would know the operants. But at no time did I have
> reason to believe the person that was telling me as I was speaking to him,
> "I am an employee of Academy Bank, I interviewed this person, I had to
> decline him a position because he had a derogatory report on his credit,"
> there was nothing that would have signaled to me this person is a fraud from
> the top to the bottom.

*Id.* at 157:23-158:9. Based on a 90-minute online video call he later had with Mr.

Retelsdorf on an unknown date, Plaintiff's other counsel, Mr. Berken, echoed this

sentiment: "And when I had the Zoom call with [Mr. Retelsdorf], he was articulate. I had

no reason to believe that this was a fraud." *Id.* at 189:20-21; *see also id.* at 165:1-4. No

one from the law firm ever met Mr. Retelsdorf in person. *Id.* at 164:16-21.

Meanwhile, on February 13, 2024, Defendant issued its first set of written

discovery requests to Plaintiff. *Def.'s Hearing Ex. 8*. Plaintiff responded, under both his

own and Mr. Berken's signature, on March 8, 2024. *Def.'s Hearing Ex. 9*. Plaintiff

amended those responses, again under his own and Mr. Berken's signature, on March

4

22, 2024. *Def.'s Ex. A-2* [#82-2] (redacted responses); *Def.'s Hearing Ex. 10* (unredacted responses). In short, Plaintiff contended in his discovery responses that he was damaged by the allegedly inaccurate credit reporting, claiming that he could not obtain the employment he wanted and could not obtain housing because of Defendant's actions. *Def.'s Ex. A-2* [#82-2] at 2-5.

On April 15, 2024, Plaintiff's deposition was taken. *Def.'s Ex. A-1* [#82-1] (partial transcript); *Def.'s Hearing Ex. 16* (full transcript). Plaintiff stated in his deposition that the loan documents he found in his glove box when he returned home with the vehicle were not the same loan documents he signed. *See Def.'s Ex. A-1* [#82-1] at 79:6-80:23, 81:4-21. Rather than being presented with a different set of documents to sign during the financing process, as alleged in the Complaint, *see* [#7-3] ¶ 17, Plaintiff instead asserted that his signature was forged on the loan documents. *See Def.'s Ex. A-1* [#82-1] at 148:7-14. Plaintiff explained in his deposition that he did not allege that the documents were forged in his Complaint [#7-3] because "[i]t was brought up in prior litigation."[6] *Id.* at 148:15-20.

On April 20, 2024, Defendant issued a subpoena to Academy Bank seeking personnel and employment records and files pertaining to Plaintiff's employment with, potential employment with, or separation from Academy Bank. *Def.'s Ex. A-4* [#82-4] at 2, 5.

On April 22, 2024, Defendant issued three more subpoenas to non-parties. First, Defendant issued a subpoena to the company TECOBI seeking, among other things,

---

[6] In his written briefing, Plaintiff "admits in part and denies in part" this statement but does not explain which part is admitted and which part is denied and does not provide any statement or evidence in opposition. *See Response* [#95] at 2 ¶ 11.

personnel and employment records relating to Plaintiff's employment with and separation from the company. *Def.'s Ex. A-6* [#82-6] at 2, 5. Second, Defendant issued a subpoena to Acoma Apartments ("Acoma") for, among other things, documents and correspondence relating to Plaintiff as an applicant, potential tenant, and/or tenant of the apartment complex. *Def.'s Ex. A-9* [#82-9] at 2, 5. Third, Defendant issued a subpoena to Encore at Boulevard One ("Encore") seeking the same types of documents and correspondence. *Def.'s Ex. A-11* [#82-11] at 2, 5.

On Friday, May 10, 2024, at 8:36 a.m., Defendant's counsel Ms. Loughmiller sent Plaintiff's counsel Mr. Camera an email stating: "I need to speak with you at your earliest convenience. What is your availability for a call today?" *Def.'s Ex. A-12* [#82-12] at 3. On Sunday, May 12 at 4:05 p.m., Mr. Camera responded: "I was out of office on Friday. Can you summarize the urgency? Happy to talk tomorrow." *Id.* On Tuesday, May 14 at 8:02 a.m., Ms. Loughmiller replied: "No worries. Do you have time to discuss today? The urgent matter concerns your client lying under oath and forging the Academy Bank letter amongst several other issues. I should be in the office all day." *Id.* at 2. At 10:42 a.m., Mr. Camera wrote: "Those are some serious allegations. I'll call momentarily." *Id.* At 10:43 a.m., Ms. Loughmiller responded: "Yes, they are very serious. Thanks!" *Id.*

Ms. Loughmiller and Mr. Camera spoke for about forty minutes over the telephone. *Tr.* [#113] at 150:11-13.[7] According to Mr. Camera, Ms. Loughmiller raised three concerns at that time: (1) "the time line of the Palisades lawsuit"; (2) "the accuracy of [Plaintiff's] depositional testimony regarding his application to certain apartment complexes"; and (3)

---

[7] The precise dates recalled by Mr. Camera in his testimony here are incorrect, as May 14, 2024, was not a Friday, and May 18, 2024, was not a Tuesday, but it is clear from the context of his statements that he is discussing counsel's conversation on Tuesday, May 14, 2024. *See Tr.* [#113] at 149:22-150:16.

"on his resume [Plaintiff] had stated that he was employed with . . . TECOBI, and . . . his resume differed from the testimony that he had provided at the deposition." *Id.* at 150:17-25. Mr. Camera testified that, at the time of this conversation, the issues relating to Plaintiff's purported application to work at Academy Bank "hadn't materialized[.]" *Id.* at 153:3-6.

On May 14, the same day that Ms. Loughmiller and Mr. Camera spoke, Academy Bank, through Amanda Gillmore Rohaus ("Rohaus"), Manager of Human Resources for Academy Bank, completed a declaration that its Human Resources Department had done a full search but was unable to locate any employment records, applications for employment, or termination-of-employment records for Plaintiff. *See Def.'s Ex. A-5* [#82-5] ¶¶ 5-6. Further, Academy Bank reviewed the September 23, 2023 denial-of-employment letter produced by Plaintiff and denied that the letter came from Academy Bank. *Id.* ¶¶ 4, 6. Ms. Rohaus stated that the letter was not consistent with the format for declination letters that have been issued by Academy Bank in the past and confirmed that neither she nor anyone else at Academy Bank sent the letter Plaintiff purports to have received. *Id.* ¶ 4.

On May 21, at 8:16 a.m., Ms. Loughmiller sent an email to Mr. Berken and to Sean Cloyes (the other named partner of Berken Cloyes, PC) saying: "Please send me your availability this week to meet and confer regarding Trans Union's intention to file a Motion for Discovery Sanctions and a Motion to Strike Plaintiff's Expert Designation." *Def.'s Ex. A-13* [#82-13] at 2.

That same day, May 21, Encore responded to Defendant's subpoena, stating that it had no documents matching the name Mark C. Beachley other than a guest card from

April of 2022. *Def.'s Ex. A-11* [#82-11] at 6 ¶¶ 5-7. The Community Manager for Encore declared that Encore has no records in its possession with Plaintiff's personal identifying information and confirmed that it is Encore's "position that this individual never applied, lived [at], or even toured the property at Encore[.]" *Id.* at 6 ¶ 7.

On May 31, TECOBI responded to Defendant's subpoena seeking Plaintiff's personnel and employment records, providing the relevant documents it had in its possession. *Def.'s Ex. A-7* [#82-7] at 26; *see also id.* at 2-25.

On June 11, Acoma responded to Defendant's subpoena by stating that it had no records relating to Plaintiff and that "it is Acoma's position that this individual never applied for, lived at, or even toured the property at Acoma." *Def.'s Ex. A-10* [#82-10] ¶¶ 5-6. Ms. Loughmiller testified that she sent a copy of Acoma's declaration to Plaintiff's counsel within a few days or so of her initial receipt of the document. *Tr.* [#113] at 33:3-35:1.

On June 16, Defendant Trans Union sent a third-party subpoena for deposition testimony to TECOBI, noticing its deposition for July 8, 2024. *Motion* [#92] at 7. On July 8, 2024, at 8:30 a.m., Defendant attempted to take the deposition of TECOBI remotely by Zoom. *Def.'s Ex. B-2* [#92-3]. However, neither the deponent for TECOBI nor counsel for Plaintiff appeared, and so around 9:00 a.m., Ms. Loughmiller made a formal Statement of Nonappearance on the record. *Id.* The court reporter confirmed that the link to the deposition had been sent to Mr. Berken and Mr. Camera on both June 11 and June 26, and Ms. Loughmiller affirmed that she had sent the link to the deposition to TECOBI when the deposition was noticed.[8] *Id.*

---

[8] Defendant states that it has not re-noticed this deposition due to the Court granting the Joint Motion to Stay Remaining Deadlines Pending Ruling on Trans Union's Motion for Sanctions and Attorney's Fees Pursuant to Rule 26 [#89]. *Motion* [#92] at 7; *Minute Order* [#91].

Later that same July 8, the deposition of Ms. Rohaus of Academy Bank was taken. *Def.'s Ex. B-1* [#92-2]. At that time, she testified regarding why Academy Bank did not return any documents in response to Defendant's subpoena; why the letter [#82-3] purportedly sent by Academy Bank could not have come from Academy Bank; that Academy Bank does not review applicant or employee credit reports; that Mr. Retelsdorf (who, Plaintiff asserts, declined to offer him an opportunity for employment at Academy Bank) was terminated from Academy Bank for cause more than two years before Plaintiff allegedly applied in November 2022; and that Plaintiff's responses to Defendant's First Set of Interrogatories regarding Academy Bank were false.[9] *See id.* at 7:17-9:1, 11:19-12:19, 13:18-14:23, 15:25-17:1, 18:10-19:25, 21:18-22:15, 23:3-19, 24:2-26:6, 28:6-29:14, 31:19-35:12, 50:1-12.

That evening of July 8, Defendant's initial Motion for Sanctions and Attorney's Fees Pursuant to Rule 25 and Memorandum in Support [#82] was filed. The next morning, July 9, Mr. Berken filed a Motion to Withdraw as Counsel [#85] on behalf of his entire firm. The same day, the Court denied without prejudice Mr. Berken's request based on several procedural deficiencies, directing that an Amended Motion to Withdraw be filed by July 11, 2024. *Minute Order* [#88]. Neither an amended motion nor a request for an extension of time in which to do so was timely filed.

---

[9] In his written briefing, Plaintiff "admits in part, denies in part, and is without knowledge as to some of the numerous allegations contained" in this statement. *Response* [#95] at 2 ¶ 36. However, he does not explain why or provide any statement or evidence in opposition there, although he complains that the sentence "contains 115 words and contains reference to over 25 pages of depositional testimony." *Id.*

On July 12, the parties' filed a Joint Motion to Stay Remaining Deadlines Pending ruling on Trans Union LLC's Motion for Sanctions and Attorney's Fees Pursuant to Rule 26 [#89], which the Court granted on July 24. *Minute Order* [#91].

On July 29, Defendant filed a Supplemental Motion for Sanctions and Attorney's Fees Pursuant to Rule 26 and Memorandum in Support [#92], i.e., the present Motion. The Supplemental Motion [#92] contained the same content as the original motion seeking sanctions, *see* [#82], but included additional information in underlined text to demonstrate the changes to the original filing. Thus, the entirety of Defendant's request for sanctions was contained within the Supplemental Motion [#92]. A single Response [#95] and a single Reply [#96] to the sanctions request were filed, both addressing the full dispute as stated in the Supplemental Motion [#92]. Thus, the Court denied the original motion for sanctions as moot. *See Minute Order* [#100] (noting that the Court would consider the exhibits attached to the original motion in adjudicating the supplemental motion).

On November 21, 2024, Plaintiff's counsel filed their Second Motion to Withdraw as Counsel [#102]. On December 5, the Court set a Motion/Evidentiary Hearing on the sanctions request for January 17, 2025, noting:

> Finally, the Court is aware of Plaintiff's counsel's Second Motion to Withdraw as Counsel [#102]. However, given that Defendant's sanctions request is partially aimed at Plaintiff's counsel (in addition to Plaintiff), the Court finds that the sanctions motion should be resolved before adjudicating the withdrawal request. Given that discovery is stayed in this action, *see Minute Order* [#91], Plaintiff's counsel would appear to incur no undue prejudice by this course of action.

*Minute Order* [#104].

At the hearing, Defendant called one witness to testify, its counsel Ms. Loughmiller. Plaintiff called two witnesses, first Plaintiff himself (who waived his attorney-client privilege), *see Tr.* [#113] at 13-18, and then his counsel Mr. Camera. The Court then sua sponte called Plaintiff's other counsel Mr. Berken. The Court found the testimony of all three attorneys to be credible. At the conclusion of testimony, the Court took the matter under advisement and stated that a written order would issue.

## II. Legal Standard

The explicit basis for Defendant's sanctions request is Fed. R. Civ. P. 26(g), although Defendant also references Fed. R. Civ. P. 11, 16(f), 30(g), 37, and 56(h),[10] as well as the Court's "inherent power." *Motion* [#92] at 8. Defendant further asserts in a footnote that "[t]he Court has discretion to dismiss this action for the reasons set forth in this Motion under FRCP 11 and FRCP 37." *Id.* at 1 n.1. However, this proposition appears to be incorrect. First, the Motion [#92] does not render apparent that Defendant fully complied with the "safe harbor" provision of Fed. R. Civ. P. 11(c)(2), which is a prerequisite for obtaining sanctions under Rule 11. *See, e.g.*, *Goode v. Zavodnick*, No. 20-cv-00742-DDD-KLM, 2024 WL 1509225, at *1 (D. Colo. Mar. 29, 2024). Second, the discovery abuses alleged by Defendant herein consist of fabricated evidence and outright lies by Plaintiff. While egregious, it is not immediately clear which provision of Rule 37

---

[10] Defendant actually references Fed. R. Civ. P. 56(g) here, citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 33 (1991). *Motion* [#92] at 8. There are two problems here. First, Defendant's pin cite is to the syllabus of the *Chambers* opinion, and not the opinion itself. As footnoted in *Chambers*, "[t]he syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for convenience of the reader." Thus, Defendant's pin cite is improper as the syllabus does not constitute appropriate legal authority. Rather, the correct cite in the opinion itself for this proposition would be to *Chambers v. NASCO, Inc.*, 501 U.S. 32, 42 n.8 (1991). Second, in 2010, the sanctions provision of Rule 56 was moved from 56(g) to 56(h); thus, Defendant's reference to Rule 56(g) is outdated and inherently incorrect.

would govern here, given that sanctions under the rule are generally permitted for failure to comply with a court order (Rule 37(b)), failure to disclose, to supplement an earlier response, or to admit (Rule 37(c)), a party's failure to attend his own deposition, serve answers to interrogatories, or respond to a request for inspection (Rule 37(d)), failure to preserve electronically stored information (Rule 37(e)), and failure to participate in framing a discovery plan (Rule 37(f)).

Returning to the explicit basis for Defendant's Motion [#92], Fed. R. Civ. P. 26(g) provides in relevant part:

> (1) Every disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name . . . . By signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry:
>
> > (A) with respect to a disclosure, it is complete and correct as of the time it is made; and
> > (B) with respect to a discovery request, response, or objection, it is: (i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law; (ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and (iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the litigation.
>
> (2) . . .
>
> (3) If a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both. The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation.

The Advisory Committee on Rules of Civil Procedure states in connection with this rule that:

The duty to make a "reasonable inquiry" is satisfied if the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances. It is an objective standard similar to the one imposed by Rule 11. In making the inquiry, the attorney may rely on assertions by the client and on communications with other counsel in the case as long as that reliance is appropriate under the circumstances. Ultimately, what is reasonable is a matter for the court to decide on the totality of the circumstances.

Rule 26(g) does not require the signing attorney to certify the truthfulness of the client's factual responses to a discovery request. Rather, the signature certifies that the lawyer has made a reasonable effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand.

Fed. R. Civ. P. 26 Advisory Committee Note to 1983 Amendment (internal citations omitted).

A finding of bad faith is not required for conduct to be sanctionable under Rule 26(g). *McFadden v. Meeker Hous. Auth.*, No. 16-cv-2304-WJM-GPG, 2019 WL 2189493, at *2 (D. Colo. May 21, 2019). Further, the Court must be careful to "avoid hindsight" and must "resolve all doubts in favor of the signer." *Id.* (quoting *Bergeson v. Dilworth*, 749 F. Supp. 1555, 1566 (D. Kan. 1990)). Deciding whether a Rule 26(g) violation has occurred "may be resolved on a summary record." *Id.* (citing Fed. R. Civ. P. 26 Advisory Committee Note to 1983 Amendment ("To prevent the proliferation of the sanction procedure and to avoid multiple hearings, discovery in any sanction proceeding normally should be permitted only when it is clearly required by the interests of justice.")).

In addition to Rule 26(g), the Court notes that it has "an 'inherent power', governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962). Part of this authority is the power to "fashion an appropriate sanction for conduct which abuses the judicial process," including fee shifting

if the Court finds that the misbehaving party "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 33, 44-45 (1991), which necessarily means that fees may be assessed if the Court discovers that "fraud has been practiced upon it," *Universal Oil Prods. Co. v. Root Refin. Co.*, 328 U.S. 575, 580 (1946). "When a party to litigation seeks to intentionally deceive the court and its adversary, a district court may issue reasonable sanctions," including, but not limited to, assessing reasonable attorney fees and dismissing claims. *Stenson v. Edmonds*, 86 F.4th 870, 873 (10th Cir. 2023).

For example, in *Stenson v. Edmonds*, the Tenth Circuit upheld imposition of sanctions including fees and the dismissal of non-economic claims where the court found that the plaintiff had engaged in a "plainly evident campaign to fabricate a claim for damages," noting that "'[b]ad faith' fails to capture the extent of Plaintiff's misconduct." 86 F.4th at 873, 876. The Circuit found that the plaintiff had "lied and misled medical personnel about the severity of the accident"; had lied to his attorneys about a lack of any prior medical treatment and about his lost income, including the creation of fraudulent checks; had lied to the defendants in sworn interrogatories regarding his medical issues; and, "most egregiously," had lied to the trial court "[u]ntil he faced proof of his fraud" and "falsified evidence to manufacture damages which were many times higher than his actual income." *Id.* at 876. The Circuit found that the trial court was "well within its discretion" to impose fees on the plaintiff and, after analyzing the five factors of *Ehrenhaus v. Reynolds*, 965 F.2d 916, 920 (10th Cir. 1992), that the trial court did not abuse its discretion in determining that some of the plaintiff's claims should be dismissed. *Id.* at 877-78.

The Court notes that it may hold an evidentiary hearing regarding whether evidence has been fabricated. *Gilmer v. Colo. Inst. of Art*, 12 F. App'x 892, 894 (10th Cir. 2001). "Trial courts have the discretion and, in fact, the obligation to make evidentiary determinations pretrial." *Id.* Evidence fabrication is "an abusive litigation practice, or even a type of fraud on the court." *Id.* The Court "clearly has the authority to examine the authenticity of evidence before submitting it to a jury" because a litigant "obviously has no right to submit fabricated evidence to the jury." *Id.* at 895. This remains true even when the factual dispute over authenticity "also goes to the merits of the case" or is "a focal point of the offeror's complaint[.]" *Id.* Waiting for a jury to decide such issues would "ignore[ ] the gravity of presenting fabricated evidence." *Id.*

Finally, the Court utilizes a "preponderance of the evidence" standard to determine whether any sanctionable conduct occurred and the extent of any such sanctionable conduct. *See Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 777-79 (7th Cir. 2016) (stating that, regardless of whether pursuant to a Federal Rule of Civil Procedure or the court's inherent authority, discovery-related misconduct underlying dismissal order need be supported only by a preponderance of the evidence); *Abbondanza v. Weiss*, No. 19-cv-00328-TMT-MEH, 2023 WL 2824321, at *7 (D. Colo. Feb. 17, 2023) (utilizing a "preponderance of the evidence" standard in determining whether the party engaged in sanctionable "vexatious, multiplied, or frivolous/bad faith conduct").

### III. Analysis

At the outset, the Court addresses two issues raised by Plaintiff's counsel. First, Plaintiff's counsel expressed surprise at the hearing that the Motion [#92] was partially directed at counsel and not only at Plaintiff. *See, e.g.*, *Tr.* [#113] at 8:18-23 ("The motion

is not directed to my firm. If it had been -- and I am troubled by the word 'culpability' -- then I would have had a conflict and I would have gotten counsel, separate counsel for Mr. Beachley and then counsel for our firm. To throw this in at the last minute, they may have problems over there."). The Court finds this belief to be without basis. Counsel for Plaintiff had plenty of warning that sanctions were requested by Defendant against counsel as well as Plaintiff.

For example, in the briefing, Defendant argued that, "[d]espite clear evidence of fabrications, including evidence from Academy Bank and the apartment complexes that refute Plaintiff's evidence, Plaintiff and his counsel continue to prosecute this lawsuit." *Motion* [#92] at 2. Defendant also argued that, at least since May 14, 2024, when Defendant's counsel discussed some of these issues with Plaintiff's counsel, Plaintiff's counsel has been "on notice of Plaintiff's frivolous suit, false deposition testimony, fraudulent discovery responses and manufactured evidence yet continued to represent Plaintiff and enable Plaintiff's continued deceit." *Reply* [#96] at 9. Defendant therefore asked that Plaintiff's counsel be found "jointly and severally liable and responsible for [Defendant's] attorney's fees and costs" since May 14, 2024. *Id.* The Court also emphasized this point in its Minute Order [#104] setting the hearing on the sanctions request, specifically stating that "Defendant's sanctions request is partially aimed at Plaintiff's counsel (in addition to Plaintiff)." Thus, the Court finds that there should have been no surprise to Plaintiff's counsel regarding the targets of the Motion [#92].

Second, although not listed by the parties as a witness, the Court determined that it must call Plaintiff's counsel Mr. Berken after the other witnesses had completed testifying in order to elucidate several points from the day's testimony. Fed. R. Evid.

614(a) provides: "The court may call a witness on its own or at a party's request. Each party is entitled to cross-examine the witness." Fed. R. Evid. 614(b) provides: "The court may examine a witness regardless of who calls the witness." In relevant part, Fed. R. Evid. 614(c) provides that "[a] party may object to the court's calling or examining a witness . . . at that time[.]" Rule 614 has no prohibition on a judicial officer sua sponte calling an attorney of record in a case. *See, e.g.*, *San Juan County, Utah v. United States*, 503 F.3d 1163, 1174 (10th Cir. 2007) (en banc), *abrogated in part on other grounds by Hollingsworth v. Perry*, 570 U.S. 693, 704, 708 (2013), *as recognized by Safe Sts. All. v. Hickenlooper*, 859 F.3d 865, 912-13 (10th Cir. 2017), (citing 29 CHARLES A. WRIGHT & VICTOR J. GOLD, FEDERAL PRACTICE AND PROCEDURE § 6234, at 18 (1997) (stating that Rule 614(a) promotes "accurate factfinding" and "gives courts broad discretion to exercise its power to call witnesses in a wide range of circumstances")). Although the Court's power under Rule 614(a) should be used sparingly, and particularly so when it comes to a party's counsel testifying, the Court found application of the rule to be especially well-suited under the circumstances of this evidentiary hearing, where the sanctions request was aimed at Plaintiff's counsel, where every other attorney of record had testified, and where Plaintiff had already explicitly waived his attorney-client privilege.

## A.    The Sanctions Request Against Plaintiff

### 1.    Whether Sanctions Are Appropriate

Defendant asserts that Plaintiff engaged in misconduct primarily on four topics: (1) Plaintiff lied about Acoma not allowing him to rent an apartment because of poor credit; (2) Plaintiff lied about Encore not allowing him to rent an apartment because of poor credit; (3) Plaintiff lied about his employment with TECOBI, including his job title, salary, and

whether he lost his job as a result of the issues underlying this case; and (4) Plaintiff lied about applying for a position with Academy Bank and about the bank not offering him employment due to poor credit history, and he fabricated or was culpable in the fabrication of a letter purportedly from Academy Bank as well as statements in another sworn letter by Mr. Retelsdorf, *see* [#95-1], submitted in response to the Motion [#92] in connection with the Academy Bank issue.[11] *See Motion* [#92] at 3-8; *Reply* [#96] at 2. The Court notes that Plaintiff's written Response [#95] does not directly address by factual submission or legal argument any of the first three issues.

### a.    Acoma

Plaintiff asserts that he was damaged by Defendant Trans Union because he was denied housing at multiple apartment complexes because of the alleged misinformation. *Def.'s Ex. A-2* [#82-2] at 4; *see also Tr.* [#113] at 131:16-20 ("Q. Just so I understand, your damages theory is based in part on the fact that Acoma did not rent an apartment to you because of your poor credit history specifically related to the Palisades entry in your credit report; is that correct? A. [by Plaintiff] Yes, Your Honor, amongst other properties, Your Honor.").

Defendant avers that "Plaintiff's claim that he was denied the ability to lease an apartment with Acoma due to his consumer report is belied by the records Trans Union received in response to the subpoena sent to Acoma, requesting any and all documents Acoma Apartments had regarding Plaintiff's attempt to lease an apartment."[12] *Motion*

---

[11] In the Motion [#92], Plaintiff also points out discrepancies between Plaintiff's Complaint [#1] and his deposition testimony. *Motion* [#92] at 2-3. However, the Court finds that the Motion [#92] cannot be reasonably read to be seeking sanctions on this specific basis.

[12] Plaintiff "denies" this statement in his written briefing but did not explain why or provide any statement or evidence in opposition. *See Response* [#95] at 3 ¶ 57.

[#92] at 7 (citing *Def.'s Ex. A-9* [#82-9]). Acoma responded to the subpoena by stating that it had no records relating to Plaintiff and that "it is Acoma's position that this individual never applied for, lived at, or even toured the property at Acoma." *Def.'s Ex. A-10* [#82-10] ¶¶ 5-6. Thus, in short, Defendant asserts, with supporting evidence, that Plaintiff lied about applying to rent an apartment at Acoma and about being denied such a rental on the basis of his poor credit. *Motion* [#92] at 7. In his written Response [#95], Plaintiff provides no evidence to dispute Defendant's evidence.

In Plaintiff's amended interrogatory responses from March 22, 2024, he stated that he applied for residency at Acoma "in approximately December of 2022 and was declined an offer of residency." *Def.'s Ex. A-2* [#82-2] at 4. At the hearing, Defendant submitted into evidence two of Plaintiff's unredacted credit reports, one dating to October 2022 (which had previously been filed on the docket in redacted form, *see Def.'s Ex. A-8* [#82-8]) and one dating to June of 2023. *See Def.'s Hearing Ex. 19* (October 2022); *Def.'s Hearing Ex. 15* (June 2023). Ms. Loughmiller testified, without opposition, that inquiries on a consumer's credit report remain there for two years. *Tr.* [#113] at 63:16-23. From two years prior to the early report, i.e., October 2020, through the date of the later report, i.e., June 2, 2023, there are no inquiries from Acoma or from any other entity that appear to have been for leasing purposes. *See Def.'s Hearing Ex. 19* at 4-5; *Def.'s Hearing Ex. 15* at Bates Nos. TU 36-37.

Plaintiff asserted at the hearing that Acoma would have done a "soft check" on his credit, which Plaintiff said would not have adversely affected his credit. *Tr.* [#113] at 99:5-19. Plaintiff further generally noted in connection with his purported apartment complex applications:

> I have e-mails from the past and communications from these complexes. Unfortunately, with property management companies, they keep approvals in their system; but when it comes to denials, they keep them for maybe a few days and then that's it. They have no need to, I guess, save denial letters for future records because most people assume when you are denied, there is no point in reapplying.

*Tr.* [#113] at 133:11-18.

The Court does not find Plaintiff's testimony regarding Acoma to be credible. The Court notes that the referenced emails were not produced during the hearing as to Acoma or any other apartment complex, and there is no indication that they have otherwise been produced in discovery prior to the entry of the stay. Plaintiff was on notice for more than six weeks that the Court was holding an evidentiary hearing on the request for sanctions against him. *See Minute Order* [#104]. Despite this notice, and despite the knowledge of Defendant's evidence as attached to its briefs, Plaintiff provided no evidence beyond his own word of *any* contact of any nature with Acoma, such as, by way of example only, email or hard-copy mail correspondence with Acoma; telephone records demonstrating calls to or from Acoma; his application submitted to Acoma; or affidavits/declarations from any non-parties with knowledge of his application to and/or denial by Acoma.

Even back in May/June 2024, when these issues were first coming to his counsel's attention, his counsel attempted to get evidence relating to Acoma and the other apartment complexes from Plaintiff, to no avail. *See, e.g.*, *Tr.* [#113] at 152:14-20 (Mr. Camera: "What I did, I saw the apartment complex issue as the most immediate and the most manageable, so I asked [Plaintiff], 'Did you, in fact, apply at these apartment complexes? Can you please get me proof? What proof do you have? Do you have on-line applications showing your application to these apartment complexes,' things of that nature."), 152:22-25 (Mr. Camera: "Nothing ultimately came of that. Physically [Plaintiff]

indicated to me that he had applied. And he indicated that as we've heard earlier today, his opinion was that these apartment complexes would not have those records.").

In short, the Court is drawn to the inescapable conclusion that no such evidence has been presented because no such evidence ever existed. In light of Acoma's declaration that it has no records relating to Plaintiff and that "it is Acoma's position that this individual never applied for, lived at, or even toured the property at Acoma," *Decl. of Acoma* [#82-10] ¶¶ 5-6, Plaintiff's mere unsupported word here is insufficient. Thus, the Court finds by a preponderance of the evidence that Plaintiff's interrogatory response regarding Acoma is fraudulent.

### b.      Encore

The evidence and issues relating to Acoma are similar to those pertaining to Encore. Here, Plaintiff states that he was declined an offer of residency at Encore. *Def.'s Ex. A-2* [#82-2] at 4. In response to a subpoena, Encore advised Defendant Trans Union that it had no documents from an inquiry matching the name Mark C. Beachley other than a guest card from April of 2022. *Def.'s Ex. A-11* [#82-11] at 2-5, 6 ¶ 6. The Community Manager for Encore declared that Encore has no records in its possession with Plaintiff's personal identifying information and confirmed that it is Encore's "position that this individual never applied, lived [at], or even toured the property at Encore[.]" *Def.'s Ex. A-11* [#82-11] at 7 ¶¶ 5-7. In short, Defendant asserts, with supporting evidence, that Plaintiff lied about applying to rent an apartment at Encore and about being denied such a rental because of his poor credit. *Motion* [#92] at 7-8. In his written Response [#95], Plaintiff provides no evidence to dispute Defendant's evidence.

In Plaintiff's amended interrogatory responses from March 22, 2024, he stated that he applied for residency at Encore "in approximately December of 2022 and was declined an offer of residency." *Def.'s Ex. A-2* [#82-2] at 4. At the hearing, Plaintiff continued to aver that he had applied to live at Encore and generally noted in connection with his purported apartment complex applications:

> I have e-mails from the past and communications from these complexes. Unfortunately, with property management companies, they keep approvals in their system; but when it comes to denials, they keep them for maybe a few days and then that's it. They have no need to, I guess, save denial letters for future records because most people assume when you are denied, there is no point in reapplying.

*Tr.* [#113] at 133:11-18. The Court notes that these emails were not produced during the hearing and there is no indication that they were produced in discovery prior to the entry of the stay.

As previously noted, at the hearing, Defendant submitted into evidence two of Plaintiff's unredacted credit reports, one dating to October 2022 and one dating to June of 2023. *See Def.'s Hearing Ex. 19* (October 2022); *Def.'s Hearing Ex. 15* (June 2023). From two years prior to the early report, i.e., October 2020, through the date of the later report, i.e., June 2, 2023, there are no inquiries from Encore or from any other entity that appear to have been for leasing purposes. *See Def.'s Hearing Ex. 19* at 4-5; *Def.'s Hearing Ex. 15* at Bates Nos. TU 36-37.

The Court's conclusions here are materially identical to its conclusions regarding Acoma, as described above. The Court does not find Plaintiff's testimony regarding Encore to be credible. Plaintiff was on notice for more than six weeks that the Court was holding an evidentiary hearing on the request for sanctions against him. *See Minute Order* [#104]. Despite this notice, and despite the knowledge of Defendant's evidence as

attached to its briefs, Plaintiff provided no evidence beyond his own word of any contact of any nature with Encore, such as, by way of example only, email or hard-copy mail correspondence with Encore; telephone records demonstrating calls to or from Encore; his application submitted to Encore; or affidavits/declarations from any non-parties with knowledge of his application to and/or denial by Encore. As previously noted, Plaintiff's counsel's attempts to get any type of proof from Plaintiff beyond his own word that he had applied to and been denied by Encore were unfruitful. *See, e.g.*, *Tr.* [#113] at 152:14-20, 152:22-25.  Thus, the Court is again drawn to the inescapable conclusion that no such evidence has been presented because it has never existed. In light of Encore's declaration that it has no records relating to Plaintiff and that it is Encore's "position that this individual never applied, lived [at], or even toured the property at Encore," *Def.'s Ex. A-11* [#82-11] at 7 ¶¶ 5-7, Plaintiff's mere unsupported word here is insufficient. Thus, the Court finds by a preponderance of the evidence that Plaintiff's interrogatory response regarding Encore is fraudulent.

### c.    TECOBI

In short, Defendant asserts that "Plaintiff lied in his deposition about being terminated from TECOBI due to his Trans Union credit report and his position and salary at TECOBI at the time of his termination." *Reply* [#96] at 8; *see also Motion* [#92] at 5-7. Thus, Defendant avers that "Plaintiff is simply fabricating damages in an attempt to bolster his unsubstantiated claims." *Motion* [#92] at 6. In his written Response [#95], Plaintiff provides no evidence to dispute Defendant's evidence, as described below.

Regarding his dates of employment, Plaintiff's resume, as produced in discovery, states that he worked at TECOBI from January 2021 to October 2021. *Def.'s Hearing Ex.*

*14* at 2 (Bates No. "Plaintiff 4"). In his deposition, Plaintiff asserted that the dates in his resume were wrong and that he actually worked at TECOBI from January 2021 to January 2022. *Depo. of Pl.* [#82-1] at 116:18-21. Defendant points out, though, that this testimony is inconsistent with testimony from elsewhere in Plaintiff's deposition, where Plaintiff stated he worked for TECOBI for nine months, not twelve.[13] *See id.* at 54:19-20. However, Plaintiff's employment records obtained directly from TECOBI show that Plaintiff was employed by TECOBI from mid-March 2021 through early July 2021, a period of less than four months. *See Def.'s Ex. A-7* [#82-7] at 7-8 (Plaintiff's "Applicant's Acknowledgment" dated March 17, 2021), 25 (Plaintiff's "Final Paycheck" with a period end date of July 2, 2021).

Regarding his job title, Plaintiff testified at his deposition that he worked as an account manager and loan officer for TECOBI. *See Depo. of Pl.* [#82-1] at 53:12-14; *see also Def.'s Hearing Ex. 14* at 2 (Plaintiff's resume stating the same). Plaintiff further testified at the hearing that he began working there as a "text Ninja," *Tr.* [#113] at 141:17-20, and that he worked his way up to "account manager/financial manager," *id.* at 125:25-126:4. He disputed that his job never "went beyond advertising," which apparently is an intermediate job between "text Ninja" and manager. *Id.* at 142:1-10, 19-21; *see also Def.'s Ex. A-7* [#82-7] at 23 (listing "Ninja," "Ads," and "Performance Manager" as the three tiers of employment, but not explicitly mentioning "account manager," "financial manager," or "loan officer"). According to the employment records obtained directly from TECOBI, Plaintiff applied for the role of "Ninja" on March 3, 2021, and on May 26, 2021, he signed

---

[13] Plaintiff "denies" this statement in his written briefing but does not explain why or provide any statement or evidence in opposition. *See Response* [#95] at 3 ¶ 41.

a Performance Team Pay Plan for TECOBI indicating that he was in the role of "Ads." *Def.'s Ex. A-7* [#82-7] at 23. There is no indication in the employment records produced by TECOBI that Plaintiff ever progressed to a managerial or officer role of any kind. *See generally Def.'s Ex. A-7* [#82-7].

Regarding his salary, Plaintiff stated in his amended interrogatory response, signed on March 22, 2024, that his salary with TECOBI was $80,000.00 and that, with commissions, his annual salary was approximately $150,000.00 between January 2021 and October 2021. *Def.'s Hearing Ex. 10* at 6. The employment records obtained from TECOBI show that a "Ninja" made $40,500 annual salary plus 10% of team commissions and that an employee in the role of "Ads" made $51,000 annual salary plus 20% of team commissions. *Def.'s Ex. A-7* [#82-7] at 23. The role of "Performance Manager" made $60,000 annual salary plus the remainder of the team commission. *Id.* There is no indication in the records that Plaintiff's salary approached the $80,000 he asserted in his interrogatory response.

Regarding the reason Plaintiff was let go from his job with TECOBI, Plaintiff testified at his deposition that he stopped working there when he was "let go due to his credit" and asserts that he was specifically released due to the "charged-off account from Palisades[.]" *Def.'s Ex. A-1* [#82-1] at 54:19-55:8. This termination of Plaintiff's employment, though, regardless of whether it occurred in July 2021, October 2021, or even January 2022, occurred long before the "charge-off" by Palisades in June 2022 and the reporting to Defendant in July 2022. *See Compl.* [#7-3] ¶ 17; *Def.'s Ex. A-8* [#82-8] at 3. Further, as previously noted, at the hearing, Defendant submitted into evidence two of Plaintiff's unredacted credit reports, one dating to October 2022 and one dating to June

of 2023. *See Def.'s Hearing Ex. 19* (October 2022); *Def.'s Hearing Ex. 15* (June 2023). From two years prior to the earlier report, i.e., October 2020, through the date of the later report, i.e., June 2, 2023, there are no inquiries from TECOBI or from any other entity known to have any relation to TECOBI. *See Def.'s Hearing Ex. 19* at 4-5; *Def.'s Hearing Ex. 15* at TU 36-37. At the hearing, Plaintiff seems to have changed his story, testifying that he was let go from TECOBI "during a mass firing." *Tr.* [#113] at 142:17-18.

The Court does not find Plaintiff's testimony regarding TECOBI to be credible. The Court finds that there are simply too many inconsistencies in Plaintiff's story for his testimony to be found credible, particularly because practically all of his own testimony tends to inflate Plaintiff's purported damages. As previously noted, Plaintiff was on notice for more than six weeks that the Court was holding an evidentiary hearing on the request for sanctions against him. *See Minute Order* [#104]. Despite this notice, and despite the knowledge of Defendant's evidence as attached to its briefs, Plaintiff has not provided a shred of evidence beyond his own word to support his version of his dates of employment, job title, salary, and reason for job termination. Thus, the Court is drawn to the inescapable conclusion that no such evidence exists. In light of the documentary evidence obtained directly from TECOBI, *see generally Def.'s Ex. A-7* [#82-7], Plaintiff's mere unsupported word here is insufficient. Thus, the Court finds by a preponderance of the evidence that Plaintiff's amended interrogatory response and associated deposition testimony regarding TECOBI is fraudulent.

### d.    Academy Bank

In the Complaint [#7-3], Plaintiff avers that, because of the allegedly erroneous information on his credit report, he "failed to qualify for certain job positions, (i.e., account

management, financial advisor, loan officer, and the like.)" *Compl.* [#7-3] ¶ 31. In his deposition, Plaintiff testified that the only job position for which he applied and was denied was one for loan officer/credit analyst with Academy Bank, stating that he did not apply for other jobs because he "knew [he] would not be accepted due to the Academy Bank denial letter and denial." *See Def.'s Ex. A-1* [#82-1] at 211:10-16, 238:14-22, 246:24-247:1, 248:8-16. Plaintiff's lost income damages are based primarily on his alleged loss of a "career that [he] wanted to make out of Academy Bank for 10-plus years[.]"[14] *See id.* at 235:24-236:3. Defendant asserts that "Plaintiff never even applied for a position with Academy Bank, and falsified evidence in an attempt to support his claim." *Motion* [#92] at 4. Plaintiff denies this assertion and provides a July 10, 2024 letter from Mr. Retelsdorf in opposition, which the Court further addresses below. *Response* [#95] at 2 ¶ 22 (citing *Pl.'s Ex. A, Notarized Statement of Andrew Retelsdorf* [#95-1]).

Plaintiff asserts that he interviewed with Academy Bank in November of 2022 and was soon thereafter told over the telephone that he was denied employment due to his poor credit. *Def.'s Ex. A-1* [#82-1] at 100:10-16. In his discovery responses, Plaintiff produced a September 23, 2023 letter purportedly from Academy Bank, explaining why it could not offer employment to Plaintiff. *Def.'s Ex. A-3* [#82-3]. In his deposition, he testified that he did not ask for the letter until September of 2023, when he realized that he needed proof that he was denied employment with Academy Bank for this lawsuit, and that he "reach[ed] out to a manager there who said he would provide the reasoning why, and this is the letter." *Def.'s Ex. A-1* [#82-1] at 100:17-102:3. Specifically, Plaintiff testified that he reached out "[d]ue to this case and opposing counsel requesting proof of

---

[14] In his written briefing, Plaintiff "denies" this statement but does not explain why or provide any statement or evidence in opposition. *See Response* [#95] at 2 ¶ 21.

declination of this job offer." *Id.* at 101:23-24. The Court notes, however, that this case was filed in state court on October 3, 2023. *See Compl.* [#7-3] at 8. Thus, it is unclear how or why Defendant's counsel would have requested proof in September 2023 of Plaintiff being denied a job with Academy Bank.

The September 23, 2023 Academy Bank letter purports to be from the Recruitment Department of Academy Bank and states: "We were unable to extend an offer of employment to Mark C. Beachley for Loan Officer/Credit Analyst in November of 2022, due to Negligent credit history/Credit score . . . which was displayed to us as a 490." *Def.'s Ex. A-3* [#82-3]. The letter noted that "Mr. Beachley had an account in collections, from a creditor named 'Palisades Funding'. The charge-off listed that the account was more than 30/60/90 days past due, and that it was charged off as bad debt, and, 'Profit and Loss Write off'." *Id.* The letter states that Plaintiff had the potential of making "anywhere between $180,000 and $230,000 a year." *Id.*

At the hearing, Ms. Loughmiller testified as to why the letter "raised red flags" for her, saying:

> I have never had a letter pull out a specific account, and I have never had a letter call an account negligent. You know, usually if somebody denies - - if they have been denied employment, they may say just because based on the Trans Union credit report or . . .  And at this time Mr. Beachley had several many more adverse accounts, so I found it interesting that Academy Bank would have pulled one, only one of the vendor's accounts out in this letter as the reason for denial.

*Tr.* [#113] at 24:5-17. Ms. Loughmiller also noted that it was peculiar that the letter did not have any specific person's name signed on behalf of the bank. *Id.* at 24:18-20.

Given these suspicions, Ms. Loughmiller sent a third-party document subpoena to Academy Bank and requested any information Academy Bank had regarding Plaintiff's

employment or potential employment with the bank. *Def.'s Ex. A-4* [#82-4]. In response, Academy Bank, through Ms. Rohaus, Manager of Human Resources for Academy Bank, had its Human Resources Department do a full search but was unable to locate any employment records, applications for employment, or termination-of-employment records for Plaintiff. *See Def.'s Ex. A-5* [#82-5] ¶¶ 5-6.

Further, Academy Bank reviewed the letter produced by Plaintiff and denied that the letter came from Academy Bank. *Id.* ¶¶ 4, 6. Ms. Rohaus stated that the letter is not consistent with the format for declination letters that are issued by Academy Bank and confirmed that neither she nor anyone else at Academy Bank sent the letter Plaintiff purports to have received. *Id.* ¶ 4. Thus, Defendant avers that "the letter was manufactured by Plaintiff, or someone on behalf of Plaintiff, to support his claim for damages."[15] *Motion* [#92] at 5.

Defendant deposed Ms. Rohaus on July 8, 2024. *See Depo. of Rohaus* [#92-2]. At that time, she testified regarding why Academy Bank did not return any documents in response to Defendant's subpoena; why the Academy Letter [#82-3] purportedly sent by Academy Bank could not have come from Academy Bank; that Academy Bank does not review applicant or employee credit reports; that Mr. Retelsdorf (who, Plaintiff asserts, was the person who had declined to offer him an opportunity for employment at Academy Bank) was terminated from Academy Bank for cause more than two years before Plaintiff allegedly applied in November 2022; and that Plaintiff's responses to Defendant's First Set of Interrogatories regarding Academy Bank were false. *See id.* at 7:17-9:1, 11:19-

---

[15] In the written briefing, Plaintiff "denies" this statement but does not explain why or provide any statement or evidence in opposition. *See Response* [#95] at 2 ¶ 34.

12:19, 13:18-14:23, 15:25-17:1, 18:10-19:25, 21:18-22:15, 23:3-19, 24:2-26:6, 28:6-29:14, 31:19-35:12, 50:1-12.

The Retelsdorf letter mentioned above was the sole evidence provided by Plaintiff in his Response [#95] in opposition to the Motion [#92]. *See* [#95-1]. The letter is dated July 10, 2024 (two days after the initial sanctions motion was filed), is signed by both Plaintiff and by Mr. Retelsdorf (along with their mailing addresses), was notarized on July 22, 2024, and was submitted to the Court on August 1, 2024. *See id.* The typed letter is worth reciting in full:

> To Whomever it may concern,
>
> My name is Andrew Retelsdorf, and I am writing this to exonerate Mark Beachley from any lash back he may receive from providing a Job Denial Letter that I wrote for him when he had attempted to apply through me for a position at Academy Bank.
>
> Mark Beachley was provided a Job denial letter from me, on September 23, 2023. I wrote in this letter that I had to deny him a job offer, for a position with Academy Bank, due to a charged off account on his credit report, from Transunion.
>
> Mark was not aware of the following facts:
>
> > 1) When Mark had applied to Academy Bank, in November 2022, I was no longer employed with the company, Academy Bank. Although I knew the hiring requirements, I strived to pre-determine Mark's eligibility to work for Academy Bank, which was wrong of me to do. I was fired from Academy Bank in September of 2020, for reasons I wish to disclose.
> >
> > 2) Mark "Interviewed" in person with me, however, I did not allow him to speak with an actual representative from Academy Bank. We talked, and walked around near the location he believed he was applying for, but Mark never entered the physical location. My intentions were pure, but only to assist him in getting a job, based off the dilemma he had explained to me about his credit, to which he had explained to me in full detail regarding his Transunion/car dealer fiasco.

3) Mark was not aware that the position I had falsely created (Credit Analyst/Loan officer) did not actually exist in the company. I would have had him directly apply to be a personal banker, by explaining the position he wanted, had been filled, thus allowing him direct contact with the company, to be determined for eligibility for hire.

4) Mark, after finding out he was "denied" did not pursue a position with Academy bank, as he believed he had no hope of working in the industry again. When I advised him there were other opportunities, he declined to pursue.

5) Mark did not know that I was being untruthful, deceptive, and created a forged document on an official Academy Bank letter head, which I had copies of, from my prior employment at Academy Bank, I understand the severity of my actions and express a deep remorse.

I, Andrew Retelsdorf acknowledge that I knowingly, and fraudulently created a false document, and provided said document to Mark Beachley, in hopes that he would continue to pursue a career with Academy Bank, to ensure he had a good income and career path for his family, as he is the sole provider for.

I acknowledge that the fraudulent letter I provided Mark Beachley will now affect his current Suit, to which I do not know the exact details of, but I take all, and full responsibility for any backlash that may come of this deceptive action. Mark did not know that I was untruthful with him, and did not know that this would so negatively impact not only his career, his future, and his suit, but was also unaware that this would also impact our professional relationship.

Mark Beachley is innocent, by means of having no Knowledge of my career, position with Academy Bank, Time employed with Academy Bank, and that the letter was fraudulently created.

I am fully prepared to be held accountable for all liabilities involved, as stated from the above, and I am fully prepared to face the consequences, whether that is from the Colorado State Courts, Transunion LLC, 26 MOTORS, Or even Mark Beachley's private Counsel. I understand that Mark Beachley is willing to testify against me in his matter, and I do not hold any grievances towards him, or his counsel. I stand ready to face the legal complications that may arise from this matter as well.

Please reach out to me with any questions.

*Id.*

In short, Defendant asserts that Plaintiff lied about applying for a position with Academy Bank and about the bank not offering him employment due to poor credit history, and that he tried to support these lies with a fabricated letter purportedly from Academy Bank and a later letter full of fabrications from Mr. Retelsdorf.[16]

The Court is highly troubled by the entire situation involving Mr. Retelsdorf. At the outset, the Court notes that there is broad agreement that Mr. Retelsdorf is a real person and not someone made up by Plaintiff. Mr. Camera testified that he texted with and later directly spoke with Mr. Retelsdorf utilizing Plaintiff's phone in February 2024. *Tr.* [#113] at 157:15-21. Mr. Berken also testified that he had a video conference with Mr. Retelsdorf somewhere around this time. *Tr.* [#113] at 189:20-21 (Mr. Berken's testimony); *see also id.* at 158:14-17, 164:19-165:4 (Mr. Camera's testimony).

Further, there appears to now be universal agreement that the September 23, 2023 letter purportedly from Academy Bank was fraudulent in all respects, not even coming from Academy Bank at all. *See, e.g.*, *Tr.* [#113] at 128:15-17, 128:23-129:1 (Plaintiff's testimony), 153:10-22 (Mr. Camera's testimony); *Def.'s Ex. A-5* [#82-5] ¶¶ 4, 6. Beyond that, Defendant believes that either Plaintiff wrote the letter or that Mr. Retelsdorf wrote the letter with Plaintiff's knowledge that the letter was fraudulent. *See Motion* [#92] at 4-5. Plaintiff avers that he had no idea that the letter was fraudulent and that it was written solely by Mr. Retelsdorf. *See, e.g.*, *Response* [#95] ¶¶ 74-75 ("That,

---

[16] Defendant argues that the Court should disregard Mr. Retelsdorf's later letter in full as a sham affidavit. *Reply* [#96] at 4-5. However, while Mr. Retelsdorf's letter may be sworn and may be a sham, it does not fall within the purview of the sham affidavit doctrine, as there is no prior sworn testimony from him in the record. *See, e.g.*, *Law Co., Inc. v. Mohawk Const. & Supply Co., Inc.*, 577 F.3d 1164, 1169 (10th Cir. 2009) (stating that the sham affidavit doctrine is applicable where the affidavit conflicts with the affiant's prior sworn statements); *see also Wasatch Transp., Inc. v. Forest River, Inc.*, 53 F.4th 577, 582 (10th Cir. 2022) ("A court may ignore a declaration if it conflicts with a witness's earlier sworn statements and would create a sham factual issue.").

upon request of Mr. Beachley for a letter stating the denial and reason, Mr. Retelsdorf authored a fabricated letter. That Mr. Beachley had no knowledge of the fraud, nor of the deception."). In fact, Plaintiff states that he was completely "duped" by Mr. Retelsdorf, believing until summer 2024 that Plaintiff had interviewed with Academy Bank through Mr. Retelsdorf, that Mr. Retelsdorf was an employee of Academy Bank at that time, and that Plaintiff had been denied a job offer by Academy Bank. *See, e.g.*, *Tr.* [#113] at 123: 4-11.

However, there are many reasons to doubt Plaintiff's version of events that he had no complicity. First, Plaintiff was on notice for more than six weeks that the Court was holding an evidentiary hearing on the request for sanctions against him. *See Minute Order* [#104]. Despite this notice and the seriousness of the potential consequences against him, Plaintiff provided no evidence beyond his testimony and the questionable Retelsdorf letter to support his version of events. By way of example only, he did not produce any contemporaneous text messages, telephone records, emails, or other forms of proof from around the time of the alleged interview in November 2022 or from when he requested the Academy Bank declination letter in September 2023. Thus, the Court is drawn to the conclusion that no such additional evidence exists to support Plaintiff's assertions.

Second, in his Response [#95], Plaintiff states that "Mr. Retelsdorf met with [Plaintiff] at the location (relevantly, an Academy Bank fixture located within a Wal-Mart shopping center)" and that the two then "walked around the Wal-Mart discussing the career under the guise of an interview." *Response* [#95] at 4 ¶¶ 69, 71. According to Plaintiff, this occurred in November 2022. *Def.'s Ex. F* [#96-6] at 164:3-10. However, Ms. Rohaus testified on July 8, 2024, that this branch of Academy Bank, located at 92nd and

Sheridan, had closed on June 17, 2022. *Def.'s Hearing Ex. 18* at 26:7-27:2; 31:6-14; *Tr.* [#113] at 94:4:14 (Plaintiff: "I met with Andrew at the Academy Bank, I believe it was 92nd and Sheridan. It's in a Wal-Mart. . . . He met me at the front of the Wal-Mart. . . . We walked right next to the Academy Bank and kind of walked through the building as well, just him asking me questions, why I wanted to be in this deal."), 123:12-19; *see also Tr.* [#113] at 160:2-15 (Mr. Camera: "I was in Larimer County in late May [2024], I believe? And on a return trip, I stopped by the Wal-Mart at 92nd and Sheridan on a lark thinking maybe I will see [Mr. Retelsdorf]. I did not see him. I think the Academy Bank was actually closed at the time I went in[.]").

Third, the only feasible way that Mr. Retelsdorf would have had access to Plaintiff's credit score was if Plaintiff himself provided it to him. Ms. Rohaus testified that Academy Bank does not do credit checks on applicants for employment. *Def.'s Hearing Ex. 18* at 18:1-21, 25:2-14. There is no indication on Plaintiff's credit reports that Mr. Retelsdorf personally checked Plaintiff's credit score. *See Def.'s Hearing Ex. 19* (October 2022); *Def.'s Hearing Ex. 15* (June 2023). Indeed, as Defendant points out, he very likely could not have done so, "either on his own or as an employee of Academy Bank because he is not a Trans Union subscriber of information, and he did not have a permissible purpose as required by 15 U.S.C. § 1681b of the Fair Credit Reporting Act[.]" *Reply* [#96] at 6; *see generally* 15 U.S.C. § 1681b (discussing the circumstances under which, and by whom, a consumer's credit report can be obtained). Further, it is undisputed that Plaintiff had multiple adverse accounts on his credit report at this time. *See, e.g., Tr.* [#113] at 125:7-10. The fact that *only* the Palisades account was mentioned in the fraudulent Academy Bank denial letter of September 2023 is strong circumstantial evidence that Plaintiff had

some involvement in the creation of the letter solely to create an issue of damages in this lawsuit.

Fourth, Plaintiff testified that he learned that Academy Bank was purportedly hiring loan officers through a third-party job application website called Indeed. *Def.'s Hearing Ex. 16* at 99:20-100:4. Plaintiff testified at the hearing that he applied to Academy Bank via Indeed through a link sent by Mr. Retelsdorf. *Tr.* [#113] at 115:1-21. Even aside from the potential discrepancy about whether he learned of the job posting from Indeed directly or from Mr. Retelsdorf, it strains credulity that Mr. Retelsdorf would create and post an entire job application online simply to fool Plaintiff.

Fifth, for the hearing, Plaintiff's counsel unsuccessfully attempted to subpoena Mr. Retelsdorf. *Tr.* [#113] at 165:5-11. They hired a service agency which "spent three nights camped outside of his house trying to serve him" but ultimately were unable to do so.[17] *Id.* at 165:14-22; *see also Reply* [#96] at 3-4 (Defendant's counsel's description and supporting evidence of her unsuccessful attempts to contact Mr. Retelsdorf between June and August of 2024). Although not dispositive, the Court finds it exceedingly curious that Plaintiff was so easily able to contact Mr. Retelsdorf to obtain the sworn letter (purportedly written two days after the initial sanctions motion was filed), and that Mr. Retelsdorf so forthrightly "fell on his sword" about having deceived Plaintiff, wishing to make all amends, but that he then disappeared into the ether. *See* [#95-1] (Mr. Retelsdorf: "I am fully prepared to be held accountable for all liabilities involved, . . . and I am fully prepared to face the consequences[.]"). However, this disappearance may partially be explained by

---

[17] Plaintiff's counsel neglected to serve opposing counsel with a Fed. R. Civ. P. 45(a)(4) notice of intent to serve the third-party subpoena on Mr. Retelsdorf. *Tr.* [#113] at 165:23-166:7.

Plaintiff's testimony that Plaintiff threatened to publicly stain Mr. Retelsdorf's reputation should Mr. Retelsdorf fail to write the letter to Plaintiff's satisfaction. *Tr.* [#113] at 128:21-129:2 ("The alternative was that I was going to put him on blast on social media for doing this. And he wanted to avoid that altogether, so he said he would right his wrongs. And I told him he would need to either come or write a letter, come talk to my attorney or write a letter regarding the fraudulent letter he had written. And he said he would write a letter and have it notarized.").

Finally, and perhaps most importantly, the entire picture presented regarding Mr. Retelsdorf's involvement in this case has one overarching, unanswered question: Assuming that Mr. Retelsdorf's fraudulent actions were all unknown to Plaintiff, what was Mr. Retelsdorf's motivation for engaging in this conduct? As Mr. Berken said: "[T]his is a gentleman who apparently wanted to help Mr. Beachley, lied about it, lied about his employment. For what motivation? He didn't stand to make any money on this." *Tr.* [#113] at 186:22-25. In his July 10, 2024 letter, Mr. Retelsdorf stated: "My intentions were pure, but only to assist him in getting a job"—something which, by all accounts, was an utter impossibility, given that Mr. Retelsdorf had been fired from Academy Bank in September 2020 for "forced balancing," more than two years prior to the purported interview with Plaintiff. *See* [#95-1] at 1; *Def.'s Hearing Ex. 18* at 27:12-28:11 (Ms. Rohaus's testimony). At the hearing, Plaintiff stated that he spoke with Mr. Retelsdorf directly after he purportedly learned that the September 2023 denial letter was a forgery. *Tr.* [#113] at 114:7-15. Incredulously, despite Mr. Retelsdorf apparently explaining to Plaintiff why he engaged in his fraudulent actions, Plaintiff could not remember any specifics on this crucial point:

Q. Did he tell you why he fabricated the letter?

A. I believe he did. It's a little fuzzy now. I apologize. I have been dealing with a lot

lately.

Q. I understand.

A. So --

Q. I understand. So it's your testimony you don't recall any explanation as far as

why he fabricated --

A. No, it's not my testimony. My testimony is I believe he provided an explanation

along the lines of that he was just trying to assist me. I don't remember specifics.

*Id.* at 114:16-25.

"Bad faith" is "that which imports a dishonest purpose and implies wrongdoing or

some motive of self-interest." *RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, No.

16-cv-01301-PAB-GPG, 2018 WL 6839800, at *10 (D. Colo. Dec. 31, 2018). Based on

the foregoing, the Court finds that Plaintiff engaged in bad faith by his complicity in the

fraudulent creation of the September 2023 Academy Bank letter and the July 2024

notarized letter from Mr. Retelsdorf. There is simply too much circumstantial evidence, as

explained above, and a lack of evidence to the contrary beyond Plaintiff's bare word, that

Plaintiff had a knowing hand in the creation of these documents, even if the full extent of

his involvement, when balanced with Mr. Retelsdorf's actions, is not entirely clear. Thus,

the Court finds by a preponderance of the evidence that Plaintiff knowingly engaged in

fraudulent action regarding his purported application to Academy Bank.

2.    **What Sanctions Are Appropriate**

Defendant seeks two forms of sanctions against Plaintiff, i.e., the entirety of its fees and costs from this lawsuit and dismissal with prejudice of Plaintiff's sole remaining claim. *See Motion* [#92] at 13; *Reply* [#96] at 10.

a.    **Fees and Costs**

The Court begins with the issue of whether fees and costs should be awarded to Defendant. "[I]f a court finds 'that fraud has been practiced upon it, or that the very temple of justice has been defiled,' it may assess attorney's fees against the responsible party[.]" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991) (quoting *Universal Oil Prod. Co. v. Root Ref. Co.*, 328 U.S. 575, 580 (1946)). Such sanctions are "limited to the fees the innocent party incurred solely because of the misconduct—or put another way, to the fees that party would not have incurred but for the bad faith." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 104 (2017). This means that a party "may recover 'only the portion of [its] fees that [it] would not have paid but for' the misconduct." *Id.* at 109 (quoting *Fox v. Vice*, 563 U.S. 826, 836 (2011)).

Here, the Court finds that fees and costs relating to Plaintiff's fraudulent behavior should be imposed on him pursuant to the Court's inherent authority and Fed. R. Civ. P. 26(g)(3), the latter of which requires "an appropriate sanction" to be imposed, which "may include an order to pay the reasonable expenses, including attorney's fees" incurred as a result of the sanctionable conduct. To be sure, Rule 26(g)(3) bars imposition of sanctions where the offending party has "substantial justification" for the violation, but none has been presented here. *See, e.g.*, *Schmelzer v. IHC Health Servs., Inc.*, No. 2:19-cv-00965-TS-JCB, 2022 WL 3108078, at *4 (D. Utah Aug. 4, 2022) (stating that providing

"substantial justification" under Rule 26(g)(3) requires the violating party to demonstrate that "there is a dispute over which reasonable minds could differ"). The Court therefore finds that Defendant should be awarded its reasonable fees and costs incurred as result of Plaintiff's misconduct.

However, the Court comes to a different conclusion regarding Defendant's blanket request for fees for the entirety of this litigation since its inception. The Court may only award fees for the entirety of the case where the "plaintiff initiates [the] case in complete bad faith, so that every cost of defense is attributable only to [the] sanctioned behavior[.]" *Goodyear Tire & Rubber Co.*, 581 U.S. at 110. To be sure, there is *some* indication that Plaintiff's lawsuit was brought in bad faith. For example, Plaintiff obtained the fraudulent Academy Bank letter in September 2023, discussed at length above, a few weeks before filing this lawsuit on October 5, 2023. Further, a major inconsistency exists between Plaintiff's October 5, 2023 Complaint [#1] and his deposition testimony regarding a core issue underlying the inception of this litigation. Plaintiff alleged in the Complaint [#7-3] that, "[i]nstead of providing Plaintiff with a loan as initially discussed for the balance ( . . . approximately $5000), 26 Motors, as an agent for Palisades, presented Plaintiff with loan documents on November 15, 2021, for a loan amount of $62,000." *Compl.* [#7-3] ¶ 17. However, at Plaintiff's April 15, 2024 deposition, he testified that the loan documents he found in his glove box when he returned home with the vehicle were not the same loan documents he signed. *See Def.'s Ex. A-1* [#82-1] at 79:6-80:23, 81:4-21. Thus, rather than being presented with a different set of documents to sign during the financing process, as alleged in the Complaint, *see* [#7-3] ¶ 17, Plaintiff asserted that his signature was forged on the loan documents. *See Def.'s Ex. A-1* [#82-1] at 148:7-14. Plaintiff's

explanation in his deposition that he did not allege that the documents were forged in his Complaint [#7-3] because "[i]t was brought up in prior litigation" was exceedingly weak. *Id.* at 148:15-20. However, while questionable, the Court cannot find by a preponderance of the evidence from the record before it that the lawsuit itself was brough in bad faith. Rather, the sanctionable actions, as discussed by the Court above, all involve Plaintiff's attempts to manufacture damages rather than the fraudulent filing of the lawsuit.

At the hearing, Defendant provided Exhibit D, Invoices of Recoverable Litigation Fees and Costs. *Def.'s Ex. 3* at 7. Defendant also submitted a Fed. R. Evid. 1006 Summary of Trans Union LLC's Attorneys' Fees and Costs, providing totals of $60,954.79 in requested fees and $5,104.45 in requested costs. Defendant did not provide separate accountings of those fees and costs incurred solely as a result of Plaintiff's fraudulent behavior and those fees and costs incurred in the normal course of litigation. Rather than the Court sorting through Defendant's records line-by-line in the first instance, the Court finds it most prudent and efficient to allow Defendant to do so first and to file a motion seeking only those fees that Defendant "would not have incurred but for the bad faith." *See Goodyear Tire & Rubber Co.*, 581 U.S. at 104.

Accordingly, the Motion [#92] is **denied in part** to the extent Defendant seeks a blanket award of fees and costs for the entirety of the lawsuit. The Motion [#92] is **granted in part** to the extent that Defendant seeks its reasonable fees and costs incurred as result of Plaintiff's bad faith conduct. These fees and costs may include, but are not limited to, fees and costs associated with subpoenas issued in connection with Academy Bank, TECOBI, Acoma, and Encore; depositions or attempted depositions of these entities;

conferral with counsel regarding these entities; and the briefing of and hearing on the sanctions request.

    b.    **Dismissal**

Defendant also seeks dismissal with prejudice of Plaintiff's sole remaining claim. *See Motion* [#92] at 13; *Reply* [#96] at 10. In determining the appropriateness of claim dismissal as a sanction, the Court analyzes the five *Ehrenhaus* factors. *Stenson*, 86 F.4th at 878 (citing *Ehrenhaus v. Reynolds*, 965 F.2d 916, 920 (10th Cir. 1992). These factors are utilized in resolving the issue of whether dismissal is an appropriate sanction under several of the Federal Rules of Civil Procedure, including Rules 11, 16(f), 37(b), and 41(b), not to mention the Court's inherent powers. *King v. Fleming*, 899 F.3d 1140, 1150 (10th Cir. 2018) (applying the *Ehrenhaus* factors on a Rule 11 sanctions motion concerning fabricated alteration of an email); *see also Stenson*, 86 F.4th at 878 (applying the *Ehrenhaus* factors on a Rule 37 sanctions motion concerning fabrication of damages).

Dismissal with prejudice "represents an extreme sanction appropriate only in cases of willful misconduct" and should be used "as a weapon of last, rather than first, resort." *Ehrenhaus*, 965 F.2d at 920; *see also Butler v. Butierres*, 227 F. App'x 719, 721 (10th Cir. 2007) (remanding on issue of dismissal with prejudice for determination of willfulness). In *Ehrenhaus*, the Tenth Circuit Court of Appeals enumerated the factors courts must consider when evaluating grounds for dismissal of an action: "(1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; . . . (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions." 965 F.2d at 921 (internal citations omitted); *see also Gates Rubber*

*Co. v. Bando Chem. Indus.*, 167 F.R.D. 90, 101 (D. Colo. 1996). "[D]ismissal is warranted when 'the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on their merits.'" *Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1144 (10th Cir. 2007) (quoting *Ehrenhaus*, 965 F.2d at 921).

Regarding the first factor, i.e., the degree of actual prejudice to Defendant, the Court finds that Defendant has been greatly prejudiced by Plaintiff's actions. *See King*, 899 F.3d at 1151 ("The more the misconduct prejudiced the opposing party, the more appropriate dismissal becomes as a sanction."). Defendant has spent excessive time, and therefore attorney fees, attempting to verify the bases for Plaintiff's false damages assertions. *See, e.g.*, *Garcia v. Berkshire Life Ins. Co. of Am.*, No. 04-cv-01619-LTB-BNB, 2007 WL 6757307, at *9 (D. Colo. Nov. 29, 2007) (finding the first factor to support dismissal where "[t]he defendants have been put to enormous additional effort and expense to ferret out the plaintiff's lies and to double check every piece of information and evidence"). Similarly, Defendant has expended significant time and fees, not to mention enduring the delay in this lawsuit, in having to litigate the present Motion [#92], thereby incurring additional prejudice. *See, e.g.*, *Faircloth v. Hickenlooper*, 758 F. App'x 659, 662 (10th Cir. 2018) ("[W]e have recognized prejudice from delay and mounting attorney's fees.") (internal quotation marks omitted). Therefore, the Court finds that this factor weighs heavily in favor of dismissal. *See, e.g.*, *Garcia*, 2007 WL 6757307, at *9 ("I have absolutely no confidence that the plaintiff would not attempt to offer additional false evidence at a trial. The risk that this court might issue judgment against the defendants based on the plaintiff's fabrications and lies is simply too great to allow the case to proceed.") (footnote omitted).

Regarding the second factor, i.e., the amount of interference with the judicial process, the Court finds that perpetration of fraud on the Court warrants a finding of interference with the judicial process to the highest degree. *See King*, 899 F.3d at 1151 ("Greater degrees of obstruction help justify a dismissal sanction."). Plaintiff's conduct "evidences a lack of respect for the Court and the judicial process." *Harrington-Sanchez v. Los Pinos Fire Prot. Servs.*, No. 19-cv-02727-CMA-KLM, 2021 WL 5181939, *4 (D. Colo. May 13, 2021). Indeed, "[i]t is hard to imagine how presenting falsified evidence to a federal district court would *not* interfere with the judicial process." *King*, 899 F.3d at 1151-52. Further, the Court has expended significant time adjudicating the present Motion [#92], from handling all the related motions filed on the electronic docket to preparing for and hold the hearing on the Motion [#92] to writing this Order and Recommendation. *See id.* at 1152 (finding that interference with the judicial process where the court had to "devote finite time and resources to deciding the sanctions motion" and related issues) (internal quotation marks omitted). Therefore, the Court finds that this factor weighs in favor of dismissal. *See, e.g.*, *Garcia*, 2007 WL 6757307, at *9 (finding that the second factor weighed in favor of dismissal where "[t]he plaintiff's deceit infected all of the pretrial procedures and interfered egregiously with the court's administration of justice[,]" and "[a]t trial, the district judge [would] have to be super-vigilant against false evidence").

Regarding the third factor, i.e., the culpability of the litigant, the Court is left with the inescapable conclusion that the ultimate culpability for these falsehoods resides with Plaintiff. *See King*, 899 F.3d at 1152 (stating that "the greater the culpability, the more appropriate a dismissal sanction becomes"). Culpability is "any intentional failure as distinguished from involuntary noncompliance. No wrongful intent need be shown" for an

intentional failure to constitute culpability. *In re Standard Metals Corp.*, 817 F.2d 625, 628-29 (10th Cir. 1987) (further citation omitted, subsequent history omitted). As related above, Plaintiff asserts that he was hoodwinked by Mr. Retelsdorf, and yet there is nothing in the record to demonstrate why Mr. Retelsdorf would want to do that. Further, Plaintiff's story regarding his time at TECOBI keeps changing or is wholly unsupported by hard evidence. In addition, despite ample time in which to provide any evidence beyond his own bare assertion that he applied for and was denied housing at Acoma and Encore, he has not done so. Plaintiff's culpable conduct is not isolated, but has occurred throughout the course of this litigation. *See, e.g.*, *Garcia*, 2007 WL 6757307, at *10 (holding that the third factor weighed in favor of dismissal where the plaintiff "intentionally lied and manufactured evidence," "acted willfully and in bad faith," "stubbornly refused to admit her misconduct," "cast blame on others," and "lied in her responses to [the court's] questions at the hearing" on the sanctions motion). In short, there appears to be no one else responsible for the current state of this lawsuit.[18] *See King*, 899 F.3d at 1153 (noting that a litigant's failure to retract evidence "when presented with evidence of its falsehood is doubly" deceitful). Therefore, the Court finds that this factor weighs in favor of dismissal. *See, e.g.*, *Stenson*, 86 F.4th at 878 (holding that the third factor favored dismissal where "he alone lied to medical professionals, wrote false checks, and sought to mislead his attorneys, Defendants, and the district court").

Regarding the fourth factor, i.e., whether the Court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance, Plaintiff had warning not only via Defendant's requested relief in the Motion, *see* [#92] at 13, but the

---

[18] As discussed in Section III.B. below, the Court finds that Plaintiff's counsel is not sanctionably responsible for the issues underlying the sanctions imposed against Plaintiff.

Court also explicitly warned Plaintiff in the Minute Order [#104] setting the hearing on the Motion [#92] that "Defendant has requested the dismissal of all claims as a sanction and, if the Court determines that sanctions are warranted, that is a sanction the Court may consider." *See King*, 899 F.3d at 1153 (holding that service of the opposing party's motion seeking dismissal as a sanction was sufficient notice to support this factor). Further, to the extent Plaintiff "fabricated evidence in interrogatory answers made under oath," further warning is unnecessary. *See Garcia*, 2007 WL 6757307, at *10 (citing *Chavez v. City of Albuquerque*, 402 F.3d 1039, 1045 (10th Cir. 2005) ("[B]ecause the perjurious testimony was given under oath, an additional warning would have been superfluous at best. Once a witness swears to give truthful answers, there is no requirement to warn him not to commit perjury or, conversely to direct him to tell the truth. It would render the sanctity of the oath quite meaningless to require admonition to adhere to it." (citation and internal quotation marks omitted)). Therefore, the Court finds that this factor weighs in favor of dismissal. *See, e.g.*, *Wallin v. Sygma Network*, No. 1:18-cv-01097-DDD-SKC, 2019 WL 6702066, at *5 (D. Colo. Nov. 18, 2019) (finding that this factor weighed in favor of dismissal where the plaintiff had "been amply warned").

Regarding the fifth and final factor, i.e., the efficacy of lesser sanctions, the Court concludes that no sanction less than dismissal would be effective. Plaintiff has expressed no remorse or apology for any of the issues underlying this Motion [#92], and it would be unfair to Defendant to force it to defend against a case where it cannot place any trust in Plaintiff's discovery responses, produced documents, or personal testimony. *See King*, 899 F.3d at 1153 (holding that the fifth factor supported dismissal where the plaintiff otherwise could "continue to abuse the judicial process by using altered evidence and

thus continue to drain judicial resources" (internal quotation marks omitted)) (citing *Jones v. Thompson*, 996 F.2d 261, 266 (10th Cir. 1993) ("Dismissing a case with prejudice serves at least two purposes. It penalizes the party whose conduct warrants the sanction and discourages 'those who might be tempted to such conduct in the absence of such a deterrent." (citation and internal quotation marks omitted)). Further, although the Court has considered the possibility of whether monetary sanctions would be an effective deterrent, either alone or in conjunction with the exclusion of falsified evidence and/or testimony, the Court finds that only dismissal would act as a sufficient deterrent where the fraudulent behavior infects so much of the case. *See, e.g.*, *Garcia*, 2007 WL 6757307, at *10 (holding that the fifth factor weighed in favor of dismissal as "[o]nly dismissal will serve as universal notice that this conduct will not be tolerated and that the courts are not open to persons who would seek justice by fraudulent means") (citation and internal quotation marks omitted). Therefore, the Court finds that this factor weighs in favor of dismissal.

Weighing the five *Ehrenhaus* factors, the Court finds that dismissal with prejudice is appropriate under the circumstances. Accordingly, the Court **recommends** that the Motion [#92] be **granted** and that Plaintiff's sole remaining claim against Defendant be **dismissed with prejudice**.

## B. The Sanctions Request Against Plaintiff's Counsel

Defendant argues that, "[d]espite clear evidence of fabrications, including evidence from Academy Bank and the apartment complexes that refute Plaintiff's evidence, Plaintiff and his counsel continue to prosecute this lawsuit." *Motion* [#92] at 2. Defendant also argues that, at least since May 14, 2024, when Defendant's counsel discussed some of

these issues with Plaintiff's counsel, Plaintiff's counsel has been "on notice of Plaintiff's frivolous suit, false deposition testimony, fraudulent discovery responses and manufactured evidence yet continued to represent Plaintiff and enable Plaintiff's continued deceit." *Reply* [#96] at 9. Defendant therefore asks that Plaintiff's counsel be found "jointly and severally liable and responsible for [Defendant's] attorney's fees and costs" since May 14, 2024. *Id.*

The Court first addresses Defendant's complaint that Plaintiff's counsel refused to dismiss the lawsuit. *See Motion* [#92] at 12-13 ("Counsel for Plaintiff refused to dismiss Plaintiff's suit against Trans Union."). Although there certainly are actions that attorneys faced by such a situation could, and probably should, take, *see, e.g.*, *Colo. R. Prof. Conduct 1.16*, unilaterally dismissing their client's lawsuit without the consent of the client is not one of them. The Court has found no legal authority to support such a position, and Defendant has provided none. *See, e.g.*, *Hancock v. Saffle*, 210 F.3d 389 (Table), 2000 WL 279144, at *1 (10th Cir. 2000) (noting, in deciding whether a case was moot, that the plaintiff's counsel had appeared and conveyed he that could not locate his newly-released client "and thus was unable to ascertain whether his client would agree to dismiss this case"); *Wilson v. Jara*, No. CIV 10-0797 JB/WPL, 2012 WL 1684595, at *7 n.7 (D.N.M. May 10, 2012) (noting that "there is a difference between decisions which terminate the litigation, such as settlement or a stipulation of dismissal, and other litigation decisions, because decisions to terminate the litigation are ordinarily left to the client," and that "decisions that terminate the litigation are ordinarily the client's prerogative"). Here, Plaintiff affirmatively refused to dismiss his case. *See, e.g.*, *Tr.* [#113] at 162:3-8.

Regarding whether Plaintiff's counsel "enable[d] Plaintiff's continued deceit," *see Reply* [#96] at 9, both Attorney Berken and Attorney Camera were questioned at the hearing about their involvement in the discovery issues outlined above. The Court found the testimony of both Mr. Camera and Mr. Berken to be credible. In particular, the Court notes that there is no indication that, at the time the responses to written discovery requests were signed in March 2024, Plaintiff's counsel had any reason to doubt the veracity of their client's statements underlying his damages, whether as to Academy Bank, TECOBI, Acoma, or Encore. *Cf. Rusk v. Fid. Brokerage Servs., LLC*, No. 2:15-cv-00853-JNP, 2018 WL 11512832, at *2 n.1 (D. Utah Mar. 30, 2018) ("[T]he court may not sanction [the plaintiff] under Rule 26(g)(3) based upon knowledge that he gained after he signed the subpoena. Only [the plaintiff's] knowledge at the time of the certification is relevant."); *see also N. Ala. Fabricating Co., Inc. v. Bedeschi Mid-West Conveyor Co., LLC*, No. 16-cv-02740-DDC-TJJ, 2018 WL 276772, at *4-5 (D. Kan. Jan. 3, 2018) (denying sanctions under Rule 26(g) and Rule 37 where the plaintiff asked the court to sanction the defendants based on false and misleading interrogatory answers and objections, which the court denied because there was no evidence at the time the answers and objections were made that the defendants knew they were being inaccurate).

Although Defendant's counsel later presented Plaintiff's counsel with evidence of Plaintiff's fraudulent conduct between mid-May 2024 and mid-June 2024, the Court finds credible the testimonial evidence by Mr. Camera and Mr. Berken that they needed time— and that they took affirmative action—to investigate these issues themselves. *See, e.g.*, *Tr.* [#113] at 191:2-5 (Mr. Berken: "We already did some investigation. We went to

Academy Bank. We called Academy Bank, tried to ask for Mr. Retelsdorf. Didn't happen. Wouldn't verify his employment. I had asked [Plaintiff] for a W-2; never got it."), 162:23-163:6 (Mr. Camera: "[W]e have limited resources. I also owe a duty to my client. I would not do anything differently. I acted very cautiously. I am a young new - - excuse me, I am a new attorney. I have been practicing for three years. This is a very difficult, aggressive profession. I am still learning when counsel is puffing versus when they are actually threatening, but through it all I did my best to look out for my client's best interests, to look out for our small firm's interests.").

As previously noted, Plaintiff's counsel's first motion seeking to withdraw as attorneys for Plaintiff was filed on July 9, 2024, one day after counsel believed the "smoking gun" of fraudulent behavior had been identified. *Id.* at 191:6-9 (Mr. Berken: "I respect opposing counsel. I can't take opposing counsel's word for something until I see the smoking gun, and I didn't have that until July 8th."). While there may have been some misplaced belief and/or misguided judgments made during this period, the Court finds that the actions taken by these attorneys were done in the pursuit of zealous advocacy for their client and did not cross ethical boundaries into sanctionable conduct. Thus, the Court finds that sanctions are not warranted either pursuant to Fed. R. Civ. P. 26(g), as there is no evidence Plaintiff's counsel engaged in improper purpose in connection with the written discovery responses, or under the Court's inherent authority, as there is no evidence that Plaintiff's counsel's actions were anchored in bad faith or done for vexatious, wanton, or oppressive reasons. *See Chambers*, 501 U.S. at 44-45.

Finally, regarding the Retelsdorf letter filed with the Court on August 1, 2024, *see* [#95-1], both Mr. Camera and Mr. Berken testified as to why they attached the letter to

Plaintiff's Response [#95] to the second sanctions Motion [#92]. *See, e.g.*, *Tr.* [#113] at 172:10-181:3 (Mr. Camera's testimony), 186:3-188:8 (Mr. Berken's testimony). In short, Mr. Camera testified that he filed the letter because, "[s]ince the letter was notarized, I was under the impression that that would carry the same weight as sworn testimony," and because he did not find the letter to be directly inconsistent with what he knew at the time. *Id.* at 174:12-14, 179:1-7. Mr. Berken also testified that he had no reason to believe that the letter had been fraudulently notarized and that the letter seemed consistent with what he knew at the time. *Id.* at 187:10-16. Although the Court is troubled that counsel did not attempt to dig deeper into the provenance of and the truthfulness of the contents of the letter before filing the document with the Court, the Court cannot find on the record before it that this misjudgment rises to the level of sanctionable conduct.

Accordingly, the Motion [#92] is **denied in part** to the extent Defendant seeks fees as sanctions against Plaintiff's counsel.

### IV. Conclusion

Based on the foregoing,

IT IS HEREBY **ORDERED** that the Motion [#92] is **DENIED in part and GRANTED in part** and further **RECOMMENDED** that the Motion [#92] be **GRANTED in part**. As outlined above, the Motion is **denied** to the extent that Defendant seeks (1) a blanket award of all fees and costs of this suit and (2) sanctions against Plaintiff's counsel. The Motion is **granted** to the extent Plaintiff seeks fees and costs against Plaintiff relating to his sanctionable conduct. The Court **recommends** that the Motion be **granted** to the extent that Defendant seeks dismissal of Plaintiff's sole remaining claim.

IT IS FURTHER **ORDERED** that Defendant shall file a Motion for Fees and Costs **no later than March 28, 2025**. Defendant should clearly explain how each billing entry and/or cost for which reimbursement is sought stems from Plaintiff's sanctionable conduct. Defendant is reminded to comply with the requirements of D.C.COLO.LCivR 54.3.

IT IS FURTHER **ORDERED** that any party may file objections **within 14 days** of service of this Recommendation. In relevant part, Fed. R. Civ. P. 72(b)(2) provides that, "within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. 2121 E. 30th St.*, 73 F.3d 1057, 1060 (10th Cir. 1996). The objection must be "sufficiently specific to focus the district court's attention on the factual and legal issues that are truly in dispute." *Id.* "[A] party who fails to make a timely objection to the magistrate judge's findings and recommendations waives appellate review of both factual and legal questions." *Morales-Fernandez v. I.N.S.*, 418 F.3d 1116, 1119 (10th Cir. 2005).

Dated: February 28, 2025                    BY THE COURT:

Kathryn A. Starnella
United States Magistrate Judge